FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 02, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SARAH A.,[1] <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] <br><br> Defendant. | No.    4:21-cv-5011-EFS <br><br> **ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF** |

Plaintiff Sarah A. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ erred in failing to account for a disabling medical opinion, the Court grants summary judgment in favor of Plaintiff, denies the Commissioner's motion for summary judgment, reverses the decision of the ALJ, and remands this case for an immediate award of benefits.

---

[1] For privacy reasons, the Court refers to every social security plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] On July 9, 2021, Ms. Kijakazi became the Acting Commissioner of Social Security. She is therefore substituted for Andrew Saul as Defendant. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

## I.    Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[3]  Step one assesses whether the claimant is engaged in substantial gainful activity.[4]  If the claimant is engaged in substantial gainful activity, benefits are denied.[5]  If not, the disability evaluation proceeds to step two.[6]

Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or mental ability to do basic work activities.[7]  If the claimant does not, benefits are denied.[8]  If the claimant does, the disability evaluation proceeds to step three.[9]

Step three compares the claimant's impairment or combination of impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[10]  If an impairment or combination of impairments meets or equals one of the listed impairments (a "listing"), the claimant is

---

[3] 20 C.F.R. §§ 404.1520(a), 416.920(a).

[4] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[5] *Id.* §§ 404.1520(b), 416.920(b).

[6] *Id.* §§ 404.1520(b), 416.920(b).

[7] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[8] *Id.* §§ 404.1520(c), 416.920(c).

[9] *Id.* §§ 404.1520(c), 416.920(c).

[10] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

conclusively presumed to be disabled.[11]  If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[12]  If the claimant can perform past work, benefits are denied.[13]  If not, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[14] If so, benefits are denied.  If not, benefits are granted.[15]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[16]  At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[17]

---

[11] *Id.* §§ 404.1520(d), 416.920(d).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[14] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98 (9th Cir. 1984).

[15] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[16] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[17] *Id.*

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

1

## II.    Factual and Procedural Summary

2

In February 2015, Plaintiff filed Title II and Title XVI disability

3 applications, alleging an onset date of December 1, 2011.[18]  Plaintiff asserted

4 disability based on Crohn's Disease, rheumatoid arthritis, colon removal/resection,

5 nerve damage of the right leg, internal colostomy bag, depression, and anxiety.[19]

6 Plaintiff's claims were denied initially and upon reconsideration.[20]  Plaintiff then

7 requested an administrative hearing.

8

## A.    Initial Administrative Hearing & Resulting Remand

9

Administrative Law Judge Jesse K. Shumway presided over the requested

10 administrative hearing via video in October 2017.[21]  Plaintiff, two impartial

11 medical experts, and an impartial vocational presented testimony.[22]  A few months

12 later, the ALJ issued a written decision finding Plaintiff was not disabled for

13 purposes of the Social Security Act ("the Act").[23]

14

Plaintiff appealed.  This Court reversed the ALJ's decision based on errors in

15 assessing Plaintiff's symptom reports and the medical opinions of Plaintiff's

16

17 _____

18 [18] AR 15.

19 [19] *See* AR 22, 253.

20 [20] AR 84–134.

21 [21] AR 15, 29.

22 [22] AR 38–83.

23 [23] AR 15–29.

treating psychologist, and the Court remanded the case for further proceedings.[24]
The Court ordered the ALJ on remand to "reweigh the medical-opinion evidence
and reevaluate RFC, Step Five, and Listing Impairments, taking into consideration
Plaintiff's symptom reports."[25]

## B.    Second Administrative Hearing

Administrative Law Judge Shumway again presided over the proceedings on
remand, and in October 2020, he held a second administrative hearing by
telephone.[26]  Plaintiff presented the sole testimony, primarily providing updates as
to her impairments, symptoms, and living situation since the initial hearing three
years prior.[27]  In November 2020, the ALJ issued a written decision again finding
Plaintiff not disabled.[28]

## C.    The ALJ's Five-Step Findings on Remand

In denying Plaintiff's disability claims, the ALJ found as follows:

- Insured Status—June 30, 2013, was Plaintiff's date last insured.[29]

---

[24] AR 856–78.

[25] AR 877.

[26] AR 760.

[27] An impartial vocational expert was also available and listed as having appeared
at the second hearing, but the ALJ did not call her to provide any testimony. *See*
AR 760, 794–808.

[28] AR 760–86.

[29] AR 763.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

- Step One—Plaintiff had not engaged in substantial gainful activity since December 1, 2011, the alleged onset date.[30]

- Step Two—Plaintiff had the following medically determinable severe impairments: "peripheral neuropathy; cervical degenerative disc disease; juvenile-onset inflammatory arthritis; and ulcerative colitis, status-post colectomy."[31]

- Step Three—Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[32]

- RFC—Plaintiff had the RFC to perform sedentary work with the following limitations:

  o She could "never crawl or climb ladders, ropes, or scaffolds."

  o She could "only occasionally balance, stoop, kneel, and crouch."

  o She could "frequently handle, finger, and feel."

  o She could "have no exposure to extreme cold or heat, vibration, or hazards (such as unprotected heights or moving mechanical parts)."

  o She could "not have concentrated exposure to pulmonary irritants."

---

[30] AR 763.

[31] AR 764.

[32] AR 769.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

○ She would "need to have ready access to a restroom throughout the workday."[33]

- Step Four—Plaintiff was unable to perform any past relevant work.[34]

- Step Five—Considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, listing the following representative occupations: Final Assembler, Charge Account Clerk, Addressor, and Cashier.[35]

The ALJ concluded Plaintiff had not been under a disability, as defined by the Act, from December 1, 2011, through the date of the ALJ's decision, November 23, 2020.[36]  Plaintiff then appealed to this Court, primarily asserting that several of the ALJ's findings in the written decision lacked sufficient analysis and explanation.

## III.   Standard of Review

A district court's review of the Commissioner's final decision is limited.[37] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[38]  Substantial evidence is "more than a mere

---

[33] AR 772.

[34] AR 785.

[35] AR 786.

[36] AR 762, 786–87.

[37] 42 U.S.C. § 405(g).

[38] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[39]  Because it is the role of the ALJ and not the Court to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[40]  The Court considers the entire record as a whole.[41]

Further, the Court may not reverse an ALJ decision due to a harmless error.[42]  An error is harmless "where it is inconsequential to the ultimate nondisability determination."[43]  The party appealing the ALJ's decision generally bears the burden of establishing harm.[44]

## IV.    Analysis

Plaintiff alleges the ALJ erred by (1) "improperly rejecting the opinions of [Plaintiff]'s medical providers," (2) "improperly rejecting [Plaintiff]'s severe

---

[39] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[40] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[41] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up).

[42] *Molina*, 674 F.3d at 1111.

[43] *Id.* at 1115 (cleaned up).

[44] *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

impairments as groundless at step two," (3) "failing to find that [Plaintiff]'s impairments meet or equal a Listing at step three," (4) rejecting Plaintiff's subjective complaints, and (5) "failing to conduct an adequate analysis at step five."[45]  For the reasons discussed below, the Court holds the ALJ reversibly erred by rejecting the disabling medical opinion of a testifying medical expert without explanation or reference to specific evidence.  Because the record establishes that Plaintiff would have necessarily been found disabled if the improperly rejected medical opinion had been given full effect, the Court finds reversal and remand for an immediate award of benefits is necessary.  Accordingly, the Court need not address the remainder of Plaintiff's arguments.

## A.    Dr. Smiley's Opinion: Plaintiff establishes consequential error.

At the 2017 hearing, Robert H. Smiley, MD, provided opinions on a variety of Plaintiff's medical conditions and impairments.  As relevant here, Dr. Smiley opined that Plaintiff's arthritis flareups would be one of her biggest "problems trying to hold down a job."[46]

---

[45] ECF No. 12 at 8.

[46] AR 48.  The Court's prior reversal was based primarily on errors in the ALJ's analysis of Plaintiff's symptom reports and the medical opinions of Dan Lowe, PhD.  *See* AR 864–75.  Therefore, at that time, the Court did not need to specifically address whether the ALJ properly accounted for Dr. Smiley's testimony regarding Plaintiff's arthritis flareups and the likely number of resulting work absences.  Still, the Court pointed out that Dr. Smiley's opinion on the matter supported

1    1.    Dr. Smiley testified that even when "reasonably well controlled" by

2          medication, Plaintiff would miss work due to arthritis flareups.

3         Dr. Smiley opined that Plaintiff's arthritis was "reasonably well controlled

4    by the monotherapy" (Cimzia) in that it allowed her to have "a lot more" good days

5    than bad.[47]  But, he said, "on bad days, she's not going to be able to work because of

6    a flare of her arthritis and her pain."[48]  Dr. Smiley initially said he was unable to

7    give an opinion as to how frequently Plaintiff's arthritis would flare up.[49]  Still, he

8    suggested caution in interpreting the "happy notes about how well she was doing,"

9    saying, "I suspect if you asked her, you would find out that she does have—even

10   though she's much better controlled on this drug than anything else she's been on,

11   I would suspect that she does have days when things flare.  I just don't know how

12   often they occur."[50]

13        Then, when directed to and asked about treatment notes suggesting that

14   Plaintiff's flareups lasted 3–5 days and she was having one flareup per month,

15   Dr. Smiley testified that he considered this to be an "overly optimistic" estimate by

16   _____

17   Plaintiff's symptom reports. AR 873–74.  And the Court ordered the ALJ to reweigh

18   all the medical-opinion evidence after taking Plaintiff's symptom reports into

19   consideration. AR 877.

20   [47] AR 44, 48.

21   [48] AR 48.

22   [49] AR 50.

23   [50] AR 50.

the rheumatologist.[51]  Dr. Smiley explained that the record suggested Plaintiff's

providers were "so pleased with her better control on [Cimzia] that they may have

understated the bad days."[52]

      2.  <u>The ALJ silently rejected Dr. Smiley's medical opinion.</u>

      Reading Dr. Smiley's testimony together, he clearly opined that Plaintiff was

likely to suffer *at least* one arthritis flareup per month, and that each such flare up

could reasonably be expected to result in Plaintiff being nonfunctional for 3–5 days.

As Dr. Smiley was a non-examining medical expert, to reject any of his medical

opinions the ALJ was required to—at a minimum—explain the rejection with

"reference to specific evidence in the medical record."[53]

      The ALJ wrote that he assigned "great weight" to Dr. Smiley's opinions, and

the ALJ provided good reasons for why Dr. Smiley's testimony warranted so much

weight.[54]  But the ALJ did not mention Dr. Smiley's opinion that Plaintiff's

---

[51] AR 52.

[52] AR 52.

[53] *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998); *see also* SSR 96-8p, 1996
WL 374184, at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion
from a medical source, the adjudicator must explain why the opinion was not
adopted.").

[54] *See* AR 781 ("I assign great weight to most of Dr. Smiley's opinion except for his
opinion that the claimant met Listing 14.09 before pregnancy."); *id.* ( ALJ
explaining that Dr. Smiley's testimony was consistent with the evidence of record,

arthritis flareups would cause her to miss work. Rather, the ALJ conflated Dr. Smiley's testimony regarding arthritis with the testimony about Plaintiff's gastrointestinal (GI) issues, saying, "Dr. Smiley testified that the claimant would not be able to work during bad flares of *abdominal conditions*, but he testified the record shows the claimant has more good days than bad."[55]

Perhaps as a result of this mistake, the ALJ implicitly rejected Dr. Smiley's opinion that Plaintiff would miss work due to arthritis flareups; the ALJ did not include any absenteeism limitation in Plaintiff's RFC.[56] And although the ALJ posed a second hypothetical to the vocational expert, it included an absence rate of only 8–10 days per year.[57] In doing so, the ALJ failed to explain why he did not credit Dr. Smiley's opinion, let alone which of Plaintiff's impairments were linked to the 8–10 absences or why her arthritis would cause her to miss no more than 10 days of work per year.

_____

he was a well-qualified physician, he reviewed the entire longitudinal record available at the time, he reasonably explained his decisions, he had knowledge of the Social Security regulations, and the subsequently received evidence was consistent with his testimony).

[55] AR 781.

[56] *See* AR 772.

[57] AR 79.

3.  <u>Plaintiff's reports of "doing well" are consistent with Dr. Smiley's opinion.</u>

Though not offered to support his implied absenteeism finding, the ALJ wrote that the record showed Plaintiff "doing very well on Cimzia and doing quite well overall.  She was pleased with the results Cimzia produced throughout the treatment period.  Moreover, the record shows arthritis . . . responded well to current treatment plans."[58]  There are indeed myriad treatment notes containing reports of Plaintiff "doing well"—or similar language—when receiving Cimzia injections.  Yet, the record makes clear that such reports were relative to Plaintiff and were made within the context of Plaintiff's ongoing arthritis problems, including flareups.

At the 2017 hearing, after Dr. Smiley gave his opinions, Plaintiff testified that her arthritis would flare up about every 10 days.[59]  When she was asked about reporting spasms and terrible pain while also reporting that she was "doing reasonably well," Plaintiff explained that her version of "reasonably well" likely did not match up with others.  She said, "I generally try to be positive.  And so, I think, comparatively speaking, I am doing reasonably well for me."[60]  She further explained that doing well for her meant "[t]he good days can be a little better, the bad days are not as bad to the point where I feel like I'm dying."[61]

_____

[58] AR 779.

[59] AR 70.

[60] AR 70–71.

[61] AR 71.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The overall medical record supports Plaintiff's testimony and Dr. Smiley's medical opinion.  It shows that before 2019, when she started reporting Cimzia's effectiveness was waning,[62] Plaintiff had consistently reported for several years that although Cimzia was by far the most effective medication tried thus far, her average arthritis pain generally remained around a six or seven out of ten.[63] Additionally, many, if not most, of the statements endorsing the effectiveness of Cimzia are merely copied-and-pasted language—likely boilerplate.[64]  Below are a just a few examples of treatment notes that provide context and illustrate why the admittedly numerous endorsements of Cimzia's effectiveness cannot reasonably be

_____

[62] *See, e.g.*, AR 1031 (July 2019: "She feels [Cimzia is] not working for her."); AR 1050 (Aug. 2019: "She is on Cimzia injections every 2 weeks for the past 7 years.  She feels sometimes it is not working as well.").

[63] *See, e.g.*, 502, 505, 542, 555, 571, 586, 595, 604, 607, 609, 612, 618 (July 2015 through Aug. 2017: Plaintiff's reports varying but most frequently indicating between 6/10 and 7/10 for her "average pain over the last week" and usually between 7/10 and 9/10 for her "worst pain" for that week).

[64] *See, e.g.*, AR 499, 549, 552, 555, 558, 561, 565, 568, 571, 574, 577, 580, 583, 586, 589, 595, 598, 604, 612, 615, 618, 621 (each including the same language: "The patient feels that current therapy is adequate.  She notes improvements in ability to perform household responsibilities and activities of daily living to her satisfaction with current therapy.").

1    interpreted to undermine Dr. Smiley's opinion that Plaintiff was likely to suffer at

2    least one absence-causing arthritis flareup per month:

3    - May 2012: Plaintiff reporting "doing pretty well," but her treating
         physician also noting she was "very anxious to get some improvement."[65]

4    - January 2013: Plaintiff "stating she is doing quite well overall.  She
         states she is really pleased with the Cimzia."  But Plaintiff also reporting

5        "that she thought she was doing well and was able to do a little bit of
         stretching and exercising and then went out with friends in the snow the

6        other day and had severe pain in the hips, knees, back, had to use a cane
         to walk and was really very non-functional for three to five days."[66]

7    - February 2014: Plaintiff "comes in today stating that she is doing
         terribly.  She states that about two weeks ago she started having back

8        pain. She had been doing well. . . . She has had back pain off and on that
         has been bothersome, but has been able to deal with that through time."[67]

9
     - September 2014: Noting Plaintiff "has done very well with the Cimzia
10       and feels that it is still doing very well *for her*," but also providing that
         Plaintiff "states she is still having pain and spasm in her trapezius on the

11       right side.  She is having difficulty with pain along the lumbar spine,
         [scapulothoracic] joints.[68]

12
     - July 2015: Noting "intermittent flares" and simultaneously stating that
13       Plaintiff "does not feel functional with their current treatments and

14

15

16   ─────────────────

17   [65] AR 344.

18   [66] AR 353.  *See also* AR 357 (simultaneously saying "Cimzia has made a huge

19   impact on her back and it is much better" while, as to her joints, noting Plaintiff

20   "has pain and uses a cane or crutches some days.  She is just very frustrated, but

21   does not want to admit that she is disabled.")

22   [67] AR 371.

23   [68] AR 385 (emphasis added).

1

2

medications," and that she "feels that current therapy is adequate.  She notes improvements in overall function and meeting responsibilities."[69]

- May 2017: Stating that Plaintiff "is doing well with the current medications," but also noting that Plaintiff reported her average weekly pain as 6/10 and observing that she "seems to be in moderate pain."[70]

3

4

Consistent with Dr. Smiley's testimony,[71] "doing well" for Plaintiff meant

5

6

she would still suffer intermittent periods of significant, sometimes extreme,

arthritis.[72]

7

8

_____

9

[69] AR 505. *See also* AR 502 (noting Plaintiff "feels that current therapy is not

10

adequate" while also stating she "notes improvements in ability to perform

11

household responsibilities and activities of daily living to her satisfaction with

12

current therapy."); AR 426 (Approx. Mar. 2015: "She has been on Cimzia as

13

monotherapy and feels like it is helping 'to a point.'  At the same time, she does not

14

want to change or try anything different at this point.  She tried multiple other

15

meds in the past always with intolerable [side effects] or lack of efficacy.").

16

[70] AR 542–43.

17

[71] *See* AR 44–54 (Dr. Smiley testifying that despite being "reasonably well

18

controlled" and the "happy notes about how well she was doing," Plaintiff was

19

likely to experience arthritis flareups that would result in work absences).

20

[72] *See, e.g.*, AR 357 (May 2013: noting Plaintiff "states she feels good" but "[s]he

21

still hurts," and she "has pain and uses a cane or crutches some days"); AR 421

22

(Feb. 2015: Plaintiff reporting that she considered arthritis pain at 5/10 to be

23

within the "acceptable range").

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 16

1

4.  <u>Plaintiff's reported activities are consistent with Dr. Smiley's opinion.</u>

2

Elsewhere in his written decision, the ALJ discussed Plaintiff's reported

3

activities in the context of Cimzia's effectiveness.[73]  For instance, the ALJ pointed

4

out that Plaintiff "reported Cimzia effective in mid-2012," and she reported

5

engaging in activities such as caring for children, performing self-care, walking her

6

dog, and participating in Zumba classes.[74]  But, to the extent this can be construed

7

as another potential reason for rejecting Dr. Smiley's opinion, the Court finds it too

8

is lacking.

9

The rare reports of Plaintiff engaging in significant activity were frequently

10

followed closely by reports of flareups or otherwise aggravated arthritis

11

symptoms.[75]  Moreover, an ability to sometimes engage in such activities, many of

12

which could be done in small time increments and at her pleasure, is fully

13

———————————————

14

[73] AR 772–73.

15

[74] AR 772.

16

[75] AR 353 (Jan. 2013: Plaintiff reporting being rendered nonfunctional for 3–5 days

17

after she "went out with friends in the snow the other day"); AR 371 (Feb. 2014:

18

Plaintiff reporting she stopped after six weeks of Zumba classes because of an

19

increase in low back pain and the pain recently extending down her right leg);

20

AR 380 (Aug 2014: reporting that after giving her dog a bear hug, she had a flare in

21

neck pain, needed to visit the emergency department, and then followed up with

22

further care); AR 542 (May 2017: reporting her pain increased after riding as a

23

passenger in a three-day car trip).

1   consistent with Plaintiff also sometimes experiencing debilitating arthritis

2   flareups.[76]

3       5.  The ALJ's unexplained rejection of Dr. Smiley's medical opinion

4           constitutes consequential error.

5       Although a showing that medication adequately controls an impairment may

6   serve as a legitimate reason to discount a medical opinion,[77] the record lacks such a

7   showing here.  Rather, to support his findings, the ALJ selected seemingly

8   supportive language without giving the language its contextual meaning.[78]  Thus,

9   despite their numerosity, without more, the notes indicating Plaintiff was "doing

10   well" on Cimzia cannot amount to specific evidence supporting the rejection of

11   Dr. Smiley's uncontroverted opinion that Plaintiff was likely to experience a

12   flareup at least once per month.[79]  Nor does substantial evidence in the record

13

14   [76] *Cf. Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (noting in the context

15   of assessing a claimant's credibility that many every-day activities do not

16   undermine a disability claim).

17   [77] *See Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017).

18   [78] *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("[T]he treatment records

19   must be viewed in light of the overall diagnostic record."); *Gallant v. Heckler*, 753

20   F.2d 1450, 1456 (9th Cir. 1984) ("[The ALJ] cannot reach a conclusion first, and

21   then attempt to justify it by ignoring competent evidence in the record that

22   suggests an opposite result.").

23   [79] *See Sousa*, 143 F.3d at 1244; *see also* SSR 96-8p.

support the ALJ's finding that Plaintiff's combined impairments would result in fewer than 12 absences per year.

Dr. Smiley testified that Plaintiff's flareups likely exceeded the "overly optimistic" once-per-month number, and he agreed that each flareup could reasonably be expected to render Plaintiff nonfunctional for 3–5 days. But Dr. Smiley's testimony leaves unclear whether he meant that Plaintiff's *average* flareup would last 3–5 days.[80] Regardless, even assuming each flareup lasted only one day, Dr. Smiley's opinion would result in Plaintiff missing a bare minimum of 12 days of work per year on average due to her arthritis alone. And, at the October 2017 hearing, the vocational expert opined that 12 absences per year would be "completely work preclusive."[81] As such, the ALJ's error was consequential, and the ALJ's decision is reversed.[82]

**B.    Plaintiff's Symptom Reports: The ALJ engaged in improper analysis.**

Though not a factor in its reversal of the ALJ's decision, the Court has grave concerns as to the appropriateness of an ALJ questioning the reproductive choices of a claimant for purposes of a disability analysis.

---

[80] *See* AR 52.

[81] AR 81.

[82] *See Molina*, 674 F.3d at 1115.

1   1.  <u>The ALJ improperly held Plaintiff's family-planning choices against her.</u>

2           In his decision, the ALJ placed undue emphasis on Plaintiff's two

3   pregnancies and improperly relied on them to discredit her, stating, in relevant

4   part, as follows:

5           The claimant reported she was pregnant on September 29, 2015.
            She was very happy about it.  She reported her providers
6           recommended stopping Gabapentin and use of medical
            marijuana.  She was going to work on stopping [prescribed]
7           opiate use as well.
            . . .
8           The claimant was pregnant again in April 2020.  She said the
            pregnancy was not planned, but she also said she was not on
9           birth control leading up to conceiving.  Her provider stated the
            claimant was high risk given her chronic medical problems and
10          polypharmacy of high-risk medications in pregnancy.
            . . .
11          Her first pregnancy tends to show the claimant's symptoms were
            not as severe as alleged.  She decided to pursue having a child
12          even though her provider advised against having children due to
            chronic conditions and the need to take Cimzia, a medication the
13          claimant admitted helped her symptoms.  She was cautioned
            again in 2020 about the dangers of pregnancy and stopping
14          Cimzia.  While I fully understanding [sic] that the desire for
            family planning is an intensely personal matter, it is
15          nevertheless difficult to reconcile the allegation of disability
            with the pursuit of pregnancy, knowing the health risk that
16          stopping an effective medication holds for her, not to mention
            the inherent physical demands of any pregnancy.  *If she were as*
17          *debilitated as alleged, the last thing one would expect would be*
            *for her to take on something as physically demanding as*
18          *pregnancy and childcare*, especially when it means abandoning
            effective treatment during pregnancy.[83]
19

20

21

22   _____

23   [83] AR 765, 776, 779–80 (cleaned up) (emphasis added).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 20

1

2

    2.  <u>The choice to have a child, by itself, is not a valid basis for discounting a</u>

        <u>claimant's symptom reports.</u>

3

    The above-quoted criticisms imply that a disabled woman would be per se

4

irrational if willing to take on the extra pain, inconvenience, and risks of a high-

5

risk pregnancy in order to have a child.  Such reasoning's lack of merit should be

6

obvious; many people reasonably consider having a family to be of paramount

7

importance—even if doing so results in great pain, danger, and/or need for

8

assistance in handling the responsibility.  Women may choose to have children at

9

great peril to their health and even their lives.  Men and women may choose to

10

become parents despite limited resources, support, or even ability.

11

    While an ALJ may properly consider specific childcare *activities*—which, of

12

course, can occur only after the child is born[84]—the Court is unaware of any

13

authority suggesting that the *choice* to become a parent can itself be used against a

14

disability claimant.  As the Court's counterpart in the Western District of

15

Washington stated, "A person's ability or desire to become pregnant is completely

16

irrelevant and should not be used by the ALJ to determine credibility (unless the

17

claimant stopped working solely because of the pregnancy and not due to a

18

disabling condition)."[85]  The Court finds no rational basis to discredit a claimant's

19

---

20

[84] *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

21

[85] *Mako B. v. Comm'r of Soc. Sec.*, No. 2:18-CV-01458-TLF, 2019 WL 4594599, at *5

22

(W.D. Wash. Sept. 20, 2019) (citing *Tilton v. Colvin*, 184 F. Supp. 3d 135, 146 (M.D.

23

Penn. 2016).

1    symptom testimony based upon the exercise of her fundamental right to bear a

2    child.[86]

3          3.    <u>Birth-control choices, by themselves, do not provide a valid basis for</u>

4              <u>discounting a claimant's symptom reports.</u>

5          The ALJ stated that Plaintiff chose "to pursue having a child" in relation to

6    her first pregnancy, and he pointed out that Plaintiff was not on birth control

7    leading up to her second pregnancy.[87]  What the ALJ left out, however, is that

8    Plaintiff testified at the 2017 hearing that her first pregnancy was unplanned.[88]

9    Indeed, at the 2020 hearing, Plaintiff testified that *each* of her two pregnancies

10   came as a surprise because she had been informed that she was incapable of

11   becoming pregnant.[89]  Thus, by omission, the ALJ misrepresented the

12   _____

13   [86] *See Carey v. Population Servs., Int'l*, 431 U.S. 678, 697 (1977) (basing analysis on

14   the fundamental right "to decide whether to bear children").

15   [87] *See* AR 776.

16   [88] *See* AR 60 (October 2017 hearing: Plaintiff testifying that her first pregnancy

17   was unplanned); AR 799 (October 2020 hearing: "I am actually expecting my

18   second child, my miracle baby.  Well, my other miracle baby.  I was told that I

19   wasn't able to have children.").

20   [89] AR 799 (October 2020 hearing: Plaintiff testifying that her second pregnancy was

21   unplanned); *see also* AR 1051 (August 2019 treatment note: "Not pregnant and not

22   planning on any children."); AR 1078 (April 2020 treatment note: indicating it was

23   an "[u]nplanned pregnancy.").

1    circumstances surrounding Plaintiff's pregnancies.  More importantly—regardless

2    of Plaintiff's subjective belief or intent[90]—the Court cannot find any reason why

3    Plaintiff's birth control choices would be relevant to the disability analysis.[91]  It

4    was therefore improper for the ALJ to discredit Plaintiff on that basis.

5    **C.    Remand: An immediate award of benefits is appropriate.**

6            Generally, when a reviewing court reverses an ALJ's determination, "the

7    proper course, except in rare circumstances, is to remand to the agency for

8    additional investigation or explanation."[92]  In this case, however, the Court finds it

9    appropriate to credit as true Dr. Smiley's opinion, because "(1) the ALJ has failed

10   to provide legally sufficient reasons for rejecting such evidence, (2) there are no

11   _____

12   [90] In the context of an unplanned pregnancy, the ALJ's criticism of Plaintiff's

13   decision to "pursue having a child" become even more problematic; it arguably

14   implies that Plaintiff's choice not to abort the unplanned pregnancy was held

15   against her.

16   [91] Indeed, beyond the general impropriety of using family-planning choices against

17   a claimant, birth-control decisions will rarely be relevant, especially given that

18   they can turn on a variety of factors, including availability, eligibility, and side

19   effects.  Even if Plaintiff's birth-control choices were somehow relevant here, the

20   ALJ did not explore Plaintiff's particular reasons for electing not to use birth

21   control.

22   [92] *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (quoting *INS v. Ventura*,

23   537 U.S. 12, 16 (2002)).

outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."[93]  More, the Commissioner has already had two chances to address Dr. Smiley's arthritis-flareup opinion—with the Court even highlighting how the opinion supported Plaintiff's symptom reports and ordering a reevaluation of the medical evidence on remand—but the ALJ again failed to adequately address that disabling medical opinion.  Accordingly, the Court finds that allowing the Commissioner to decide this same issue yet again would result in an unfair "heads we win; tails, let's play again" scenario.[94]

## V.    CONCLUSION

The Court reverses the decision of the ALJ because he failed to adequately explain why he again rejected Dr. Smiley's opinion that Plaintiff was likely to miss work at least 12 days per year due to arthritis flareups.  Because Plaintiff would have necessarily been found disabled if Dr. Smiley's opinion had been credited, and because of the equitable considerations, the Court finds further substantive proceedings would be inappropriate and remands for an immediate award of benefits.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The case caption is to be **AMENDED** consistent with footnote 2.

---

[93] *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

[94] *Benecke*, 379 F.3d at 595.

2.      The decision of the ALJ is **REVERSED** and this matter is

**REMANDED** to the Commissioner of Social Security pursuant to

sentence four of 42 U.S.C. § 405(g) for an immediate award of

payments beginning from Plaintiff's alleged onset date.

3.      Plaintiff's Motion for Summary Judgment, **ECF No. 12**, is

**GRANTED**.

4.      The Commissioner's Motion for Summary Judgment, **ECF No. 13**, is

**DENIED**.

5.      The Commissioner is **DIRECTED** to provide a copy of this order to

Administrative Law Judge Jesse K. Shumway.

6.      The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff.

7.      The case shall be **CLOSED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order and

provide copies to all counsel.

**DATED** this 2nd day of March 2022.


_____s/Edward F. Shea_____
EDWARD F. SHEA
Senior United States District Judge

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 25